# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JENNIFER MARIE SANCHEZ**
       **Plaintiff,**

    **v.**                           **Case No. 21-C-290**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
         **Defendant.**

---

## DECISION AND ORDER

In May 2007, the Social Security Administration awarded disability benefits to plaintiff Jennifer Sanchez. The agency is required to periodically review a claimant's entitlement to benefits to ensure that she is still disabled, 42 U.S.C. § 421(i); 20 C.F.R. § 416.994(a), and in January 2015 the agency found that plaintiff's disability continued. In October 2018, however, the agency determined that plaintiff was no longer entitled to benefits. Plaintiff requested review of this determination by an Administrative Law Judge ("ALJ"), but the ALJ concluded that the evidence demonstrated medical improvement such that plaintiff could perform a range of sedentary, unskilled work. Proceeding pro se, plaintiff seeks judicial review of the ALJ's decision.

## I.  LEGAL STANDARDS

### A.    Disability Review

Initial eligibility for disability benefits is determined by applying a five-step analysis, in which the ALJ considers whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or

equals an impairment listed in the regulations ("the Listings") as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves her unable to perform her past relevant work; and (5) the claimant is unable to perform any other jobs existing in significant numbers in the national economy. Butler v. Kijakazi, 4 F.4th 498, 501 (7th Cir. 2021).

As indicated above, there is a statutory requirement that, if a claimant is found disabled, her continued entitlement to benefits be reviewed periodically. 20 C.F.R. § 416.994(a). In conducting a disability review, the agency follows a seven-step process in determining whether a claimant is still disabled. 20 C.F.R. § 416.994(b)(5).

Step 1. Does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment set forth in the Listings? If so, disability continues.

Step 2. If not, has there been "medical improvement" in the claimant's condition since the most recent decision in her favor, i.e., the "comparison point decision" or "CPD"? Medical improvement is any decrease in the medical severity of the impairments present at the time of the most recent favorable decision that the claimant was disabled or continued to be disabled. 20 C.F.R. § 416.994(b)(1)(i).

Step 3. If there has been medical improvement, does that improvement relate to the claimant's ability to work?

Step 4. If there has been no medical improvement (as determined at step 2) or if that improvement is not related to the claimant's ability to work (as determined at step 3), disability continues.

Step 5. If medical improvement relates to the claimant's ability to do work, are the

2

claimant's current impairments severe?

Step 6. If the impairments are severe, will the claimant's current residual functional capacity ("RFC") permit her to perform her past work? If so, disability ends.

Step 7. If the claimant cannot do past work, can she do other work given her current RFC, age, education, and work experience? If so, disability ends; if not, it continues.

## B. Judicial Review

The court will uphold an ALJ's decision if he applied the correct legal standards and supported his decision with substantial evidence. Surprise v. Saul, 968 F.3d 658, 661 (7th Cir. 2020). Substantial evidence is not a high threshold: it means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Karr v. Saul, 989 F.3d 508, 511 (7th Cir. 2021). The reviewing court will not re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's; rather, the court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions. Reynolds v. Kijakazi, 25 F.4th 470, 473 (7th Cir. 2022).

## II. FACTS AND BACKGROUND

## A. Plaintiff's Initial Application

Plaintiff initially applied for disability benefits in February 2007, alleging an onset date of January 19, 2002. (Tr. at 184.) The record contains hospital records from February 2002, when plaintiff was 22 years old, indicating that plaintiff was seen for gait ataxia, nausea and decreased coordination of the left upper extremity, admitted for management of a suspected medullary mass, and subsequently underwent a craniectomy for biopsy and excision of the mass. Pathology revealed an intramedullary cavernoma. Physical therapy assisted with gait

3

training, and plaintiff reported marked decrease of symptoms in her left arm. (Tr. at 315-16.)

On April 19, 2007, after she applied for benefits, the agency sent plaintiff for a consultative exam with Ward Jankus, M.D. Plaintiff complained of left-sided weakness, numbness, and left thigh pain, which she attributed to the February 2002 surgery and an assault occurring three months later. She had received limited treatment since then due to lack of insurance. (Tr. at 333.) She also complained of bowel and bladder issues, as well as cognitive deficits. (Tr. at 334.) Dr. Jankus assessed history of brain surgery with residual left side symptoms and some cognitive changes, as well as bowel and bladder issues, and rule out left greater than right hip degenerative changes. (Tr. at 336.) Dr. Jankus noted that from a mobility standpoint plaintiff seemed fairly limited, and cognitively there seemed to be some suggestion of difficulty with short-term memory as well as computation and concentration issues. (Tr. at 337.) An x-ray revealed moderate to severe osteoarthritic changes in both hips. (Tr. at 338.) The agency granted plaintiff's 2007 application.

## B. Disability Review

As required, the agency subsequently reviewed plaintiff's condition to ensure that disability continued. (Tr. at 198-224.) Of significance here, on January 27, 2015, the agency continued plaintiff's benefits, with a primary diagnosis of osteoarthrosis and allied disorders. (Tr. at 91, 94.) As part of that review, the agency sent plaintiff for psychological and neurological consultative evaluations (Tr. at 401-11), but benefits were continued based on the review of Mina Khorshidi, M.D., who found Listing 1.02A met based on hip degenerative joint disease (Tr. at 413). Dr. Khorshidi noted that plaintiff underwent left hip replacement in 2010, with plans for right hip replacement after she lost weight. Dr. Khorshidi found no significant medical improvement since the previous decision. (Tr. at 413.) The January 27, 2015,

4

determination constitutes the comparison point decision for purposes of this action.

In July 2017, plaintiff underwent right total hip replacement surgery. (Tr. at 414-15, 431-33.) She subsequently reported issues with incision healing (Tr. at 486-87, 500), but in physical therapy she demonstrated improved range of motion, strength, and mobility (Tr. at 446-71). During therapy sessions, she reported being on her feet most of the day with her nephews. (Tr. at 467, 468.) During an October 2017 follow-up, plaintiff reported doing well with no new issues and no pain (Tr. at 571), and the provider noted normal gait and stable station (Tr. at 572). At her six-month follow-up in January 2018, plaintiff again reported doing well with no new issues and pain at 0 (Tr. at 573), and on exam the provider noted full, normal range of motion of the hips, 5/5 strength, intact sensation throughout the legs, and normal gait and station (Tr. at 573). X-rays showed stable alignment of the prosthetic components. (Tr. at 557, 573.)

In April 2018, plaintiff was seen following a fall from a scooter while at Disney Land. (Tr. at 586.) X-rays revealed a closed right ankle/foot fracture, and she was provided a walking boot and pain medication. (Tr. at 588, 648.) In May 2018, a provider in Wisconsin recommended plaintiff continue using the walking boot. (Tr. at 651.) In June 2018, plaintiff reported that her walking was back at baseline, with some continued achiness in her foot. (Tr. at 656.) The provider did not feel any physical therapy was warranted but did provide a lace up ankle brace for walking long distances. (Tr. at 659.)

In July 2018, at her 12-month follow-up after the hip surgery, plaintiff reported doing well with no issues with her hip, although she was recovering from the ankle fracture. (Tr. at 626.) On exam, she displayed normal range of motion of the hips, 5/5 strength, and normal gait with the use of a walker. (Tr. at 627.) X-rays showed no evidence of loosening or fracture in the right hip. (Tr. at 641.)

5

The agency commenced another disability review in August 2018, sending plaintiff for consultative evaluations. (Tr. at 684.) On August 25, 2018, plaintiff saw Kurt Reintjes, M.D., for an orthopedic examination, complaining of pain in her bilateral hips. She stated it was painful for her to walk without support of a walker, and that she needed to have a four-wheeled rolling walker for support because of balance issues. She attributed the balance issues to an intra-cranial aneurysm, stating she also had short-term memory loss. She was morbidly obese and unable to get up onto the examination table. She stated that she could walk one block with her walker but had difficulty standing for longer than a few minutes. She stated she could sit for three hours if her legs were elevated. (Tr. at 680.) Upper extremity exam was within normal limits with bilateral grip strength of 5/5, full range of motion, and intact dexterity for fine and gross movements. On lower extremity exam, plaintiff was able to flex both hips to about 45 degrees, although there was some stiffness into the left hip. Her gait appeared to be stable. She used the walker, but it appeared to be more for a confidence issue. As she walked, she did not put weight onto the walker but rather pushed it. In fact, she was able to open the door with her left hand, hold the door open, push the walker through it, and walk through with a steady gait. Range of motion of the knees and ankles was within normal limits. Dr. Reintjes's impression was: "Bilateral total hip arthroplastic procedure, still developing confidence in her gait, likely should use the roller for a period of time as she develops her strength and confidence; also presents the possibility of a fall risk at this time because of her obesity." (Tr. at 681.)

On September 25, 2018, plaintiff saw Kalpana Rao, Ph.D., for a psychological evaluation. Plaintiff reported experiencing short-term memory problems, vision problems, and headaches since her 2002 brain surgery. (Tr. at 685.) Dr. Rao noted that plaintiff presented

6

with clear and coherent speech, able to understand questions and respond appropriately, and maintaining adequate focus and concentration to complete the session. She walked with the help of a walker, although she did not appear to be using it for much support. Her pace and stability of gait appeared to be reasonably adequate without any assistive devices. (Tr. at 686.) On mental capacity testing, she displayed no or only mild difficulty with various tasks (Tr. at 687), and Dr. Rao found no or only mild impairment in various areas of work capacity (Tr. at 688-89). Dr. Rao assessed somatic symptom disorder and dependent personality disorder. (Tr. at 689.)

On October 2, 2018, Jason Kocina, Psy.D., completed a psychiatric review technique report, evaluating plaintiff under Listings 12.07 (somatic disorders) and 12.08 (personality disorders). (Tr. at 695.) In the broad areas of mental functioning, he found mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; mild limitation in concentration, persistence, and pace; and moderate limitation in adapting or managing oneself. (Tr. at 707.) In a mental RFC assessment report, Dr. Kocina found no significant limitations in understanding and memory, or in sustained concentration and persistence, and moderate limitations in several areas of social interaction and adaptation. (Tr. at 691-92.) Dr. Kocina concluded that plaintiff could meet the basic mental demands of unskilled work. (Tr. at 694.)

On October 2, 2018, Pat Chan, M.D., completed a physical RFC assessment report, finding plaintiff capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and walking at least two hours in an eight-hour day, and sitting about six hours in eight-hour day, with no other limitations. (Tr. at 711-18.) Dr. Chan explained that the exams from plaintiff's treating orthopedist in July 2018 and from the consultative examiner in August 2018 both

7

showed her hips were doing well. The examiner also commented on her use of a walker, which Dr. Chan stated "does not appear to be medically necessary." (Tr. at 718.) She had a small displaced fracture after her scooter fall, which subsequently healed very well. Taking into account her insecurity about stability, de-conditioning, and morbid obesity, Dr. Chan found an RFC for lifting 20 pounds occasionally and 10 pounds frequently, standing/walking a total of four hours, and sitting six hours per day. (Tr. at 718.)

On October 9, 2018, the agency concluded that plaintiff's health had improved since the last review, and that she was able to work. (Tr. at 92, 96.) Plaintiff requested reconsideration (Tr. at 101), but the agency maintained its determination on August 8, 2019 (Tr. at 948-49), based on the reviews of William Fowler, M.D., and Deborah Pape, Ph.D. Dr. Pape found no severe mental impairments. (Tr. at 958-72.) Dr. Fowler concluded that plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, stand/walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Dr. Fowler noted that plaintiff used a walker during exams, but this did not appear to be medically necessary. Her gait appeared stable on exams, and range of motion was within normal limits except hip flexion. (Tr. at 951.) Dr. Fowler further limited plaintiff to occasional stooping/crouching due to hip range of motion limitations (Tr. at 952) but assessed no other limitations (Tr. at 953-54). Dr. Fowler concluded that at the time of the CPD plaintiff had severe degenerative changes in the right hip with need for replacement. At present, she had the replacement done, without ongoing hip pain and improved range of motion. She continued using a walker, although it did not appear to be medically necessary. (Tr. at 957.)

After a state hearing officer upheld the determination (Tr. at 109-135), plaintiff requested a hearing before an ALJ (Tr. at 143). Prior to the hearing, plaintiff submitted reports from

8

Jennifer Boerger, APNP, her primary provider,[1] and William Bake, D.O., her neurologist.[2]

---

[1]The record shows that plaintiff periodically saw NP Boerger related to the impairments at issue in this case. For instance, on November 17, 2017, plaintiff complained of increasing dizziness, lightheadedness, and headache discomfort, similar to the symptoms she had prior to her surgery. (Tr. at 772.) NP Boerger ordered an MRI of brain (Tr. at 773), which came back normal (Tr. at 848-51). On March 16, 2018, plaintiff saw NP Boerger needing a new seated wheeled walker. Plaintiff reported ongoing balance issues due to the previous brain surgery, with falls in 2015, resulting in an ankle fracture, and 2017, resulting in a right knee contusion. She indicated that the hip replacements had improved her pain and exercise tolerance. (Tr. at 1030.) On exam, she ambulated very slowly using her walker for support. (Tr. at 1031.) On March 4, 2019, plaintiff saw NP Boerger for a physical exam to make sure she was healthy enough to go on a trip to Hawaii. She had no medical concerns at that time. Her ambulation had improved since her second hip replacement. She continued to have some balance issues secondary to her brain tumor, but overall she was doing quite well. Boerger assured plaintiff that her physical exam was unremarkable. Ambulation was much improved. Nevertheless, she would most likely use a wheelchair or scooter while on vacation. (Tr. at 747.) On December 16, 2019, plaintiff reported being worried about her health insurance, causing anxiety, headaches, and dizziness. She was given an appointment with NP Boerger on December 30. (Tr. at 986.) On December 30, 2019, plaintiff saw NP Boerger for ongoing chronic headaches. When she had them, she went into a dark room to rest. She also reported some lower extremity weakness and intermittent dizziness. (Tr. at 985.) NP Boerger ordered a head CT (Tr. at 986), which was unremarkable (Tr. at 990). In January 2020, plaintiff's mother called Boerger's office for a report showing plaintiff was still eligible for social security. (Tr. at 984.) Plaintiff also asked if anything else could be done, and Boerger's office placed a referral to neurology. (Tr. at 985.)

[2]The record shows that plaintiff first saw Dr. Bake on March 6, 2020. She reported that since 2002 she had been weak on her left side and also had chronic headaches. Over the years, her symptoms had mostly been stable. Several months ago, she noted that her vertigo had become more frequent. She currently experienced several episodes per month, lasting from a few hours to all day. She also reported headaches several times a month, lasting from 30-120 minutes, associated with photophobia and nausea. She further endorsed poor short-term memory since 2002. (Tr. at 1038.) On exam, she displayed normal language, was alert and oriented, able to name the last three presidents, with no right or left digit confusion, able to spell "world" backwards, and recent and remote memory otherwise intact. She had mild difficulty with multi-step commands. Naming, repetition, attention span, and concentration were otherwise intact. Fund of knowledge was appropriate. Visual acuity decreased peripherally. Eye movements were normal. Strength was 4+/5 in hip and knee flexion, otherwise 5/5 throughout. Sensation was intact and reflexes 2+ and symmetric. Gait was narrow based with valgus deformity, and she ambulated with a walker. Dr. Bake's assessment was: "A 40-year old female who presents for evaluation/establish care for history of cerebral cavernous malformation, headache syndrome and vertigo. Her neurologic exam is significant for a mild degree of multi-domain mild cognitive impairment and mild bilateral lower extremity weakness.

9

In his April 2020 report, Dr. Bake opined that plaintiff could walk less than five city blocks, continuously sit for one hour and stand for 15 minutes; in a day, she could stand/walk less than two hours and sit about two hours. She required a job that permitted shifting positions at will, as well as unscheduled breaks during the workday—four times per day lasting 15 to 30 minutes—due to pain, fatigue, and vertigo. (Tr. at 1008.) She did not need to elevate her legs while sitting, nor did she need an assistive device for standing/walking. She could rarely lift less than 10 pounds, rarely twist and climb stairs, and never stoop, crouch, or climb ladders. She had no manipulative limitations. (Tr. at 1009.) Finally, she would be off task 25% or more of the time, was incapable of even low stress work, and would be absent more than four days per month. (Tr. at 1010.)

In a May 2020 report, NP Boerger indicated plaintiff could walk ½ to one city block, continuously sit for 20 minutes and stand for 15 minutes; in a day, she could stand/walk and sit about two hours. She required a job that permitted shifting positions at will and needed to include periods of walking around during the workday. She also needed unscheduled breaks during the workday, four times per day lasting about 10 minutes, due to muscle weakness, pain, and urinary incontinence. (Tr. at 1013.) Unlike Dr. Bake, NP Boerger found that plaintiff did need to elevate her legs with prolonged sitting and did need an assistive device for standing/walking. She could never lift any weight; never twist, stoop, crouch, or climb ladders; and rarely climb stairs. She could never use her hands and arms for manipulation or reaching.

_____

Her exam is otherwise nonfocal." (Tr. at 1040.) Dr. Bake ordered an MRI brain/MRA head and neck. For her headaches, he tried riboflavin. For vertigo, they would continue to monitor, considering a referral to vestibular therapy should the vertigo worsen. She would follow up in six months. (Tr. at 1040.) The MRI/MRA scans revealed no significant abnormalities. (Tr. at 1041-45.) On June 4, 2020, plaintiff saw ophthalmology based on frequent headaches (Tr. at 1054), with a largely normal exam (Tr. at 1058-59).

10

(Tr. at 1014.)  Finally, she would be off task 25% or more of the time, was incapable of even low stress work, and would be absent more than four days per month.[3]  (Tr. at 1015.)

Plaintiff also submitted a June 8, 2020, letter from Ruku Young, MSW, her Community Care case manager.  The letter indicated that plaintiff had a paid care-giver 15 hours per week to assist with bathing, dressing, meal preparation, and chores.  She lived with her brother, who also helped her.  (Tr. at 1063.)

## C.    Hearing

On June 22, 2020, plaintiff appeared pro se for a telephonic hearing before the ALJ.[4]  The ALJ also called on a vocational expert ("VE") to provide testimony on jobs plaintiff might be able to do.  (Tr. at 39.)

### 1.    Plaintiff

Plaintiff testified that she stood 5'11" and weighed 315 pounds.  (Tr. at 52.)  She had a college degree.  (Tr. at 53.)  She was not working and had not worked since 2002.  (Tr. at 53-

---

[3]In an associated progress note, NP Boerger noted that plaintiff had a history of cerebral cavernous malformation with intra-cranial bleeding that required brain resection.  After her surgery in 2002, she had residual left-sided weakness, chronic headaches, vertigo, short-term memory deficits, mild cognitive impairment, and balance issue.  Prognosis was good.  Plaintiff's symptoms included chronic back pain, left-sided weakness, chronic headaches, vertigo, short-term memory deficits, and fragmented sleep.  Due to her balance issues, she used a seated walker, cane, or scooter with ambulatory activities.  She needed help with personal cares including bathing, washing hair, and shaving.  She fatigued easily after walking approximately 10 feet or more and did not drive.  She also had chronic pain related to migraines and chronic low back pain due to abnormal gait and bilateral hip replacements.  She had chronic left-sided weakness secondary to the previous intra-cranial bleeding.  She had abnormal gait, with frequent falls, and short-term memory loss and slowed recall.  (Tr. at 1016.)  She had mild anxiety and depression when outside the home, and became overwhelmed easily in loud environments.  (Tr. at 1017.)

[4]The ALJ conducted the hearing telephonically due to the COVID-19 pandemic.  (Tr. at 42.)  Plaintiff consented to this procedure.  (Tr. at 44.)

54.)  Asked why she could not work, plaintiff first mentioned neurological issues, including vertigo and dizziness, which she experienced three to five days per month and required her to lay down in a dark room.  (Tr. at 54.)  She was seeing a new neurologist, who suggested Vitamin D, but so far that treatment was not working.  (Tr. at 55-56.)

Plaintiff also mentioned headaches, lasting an hour or two; neck pain, which limited her ability to sit without neck support; nausea in the morning and from certain smells; painful cysts in her breasts (Tr. at 57); and irritable bowel syndrome ("IBS"), which caused incontinence (Tr. at 57-58) and required frequent bathroom breaks (Tr. at 59).  She indicated that her mother assisted her with washing her hair due to problems with her left arm.  (Tr. at 58.)  She stated that her legs felt better since the hip replacement surgeries, but it still hurt to stand for five or ten minutes.  (Tr. at 59-60.)  She had a walker with a seat, which allowed her to sit down and relax.  (Tr. at 60.)  She also reported breaking her ankle in a fall, with continued swelling unless her legs were elevated.  (Tr. at 61.)  Plaintiff further reported experiencing short term memory loss, such as forgetting to turn off the stove  (Tr. at 62), as well as fatigue (Tr. at 63).

Plaintiff testified that she was not receiving treatment for the headaches.  (Tr. at 64.)  Nor was she taking pain medications.  (Tr. at 64-65.)  She avoided bright lights and loud sounds as headache triggers.  (Tr. at 66.)  For her urinary incontinence/IBS, she used pads and tried diet modification.  (Tr. at 67-68.)

Plaintiff testified that she always used a walker.  She indicated that she had two walkers, one for use in her house and one for when she went out.  (Tr. at 69.)  She stated that "some doctors . . . think it's somewhat mental, but like I said, if I hadn't used my walker, I'm a little shaky."  (Tr. at 70.)  She last experienced a serious fall a couple years ago.  (Tr. at 70.)

Plaintiff testified that, in a typical day, she got up and used the bathroom, waited for her

12

nausea to fade, then ate some food prepared by her mother. (Tr. at 71-72.) Her mother also helped her bathe. She would then go on the computer, watch TV, or read for a couple hours. Her mother made her lunch, and in the afternoon her siblings would come over. In the evening, she would go on the computer for a bit, then take a second shower. If she was having a good day, her mother or one of her siblings would take her shopping. She would then go to sleep, although she did not sleep well and was about to undergo a sleep study. (Tr. at 72.) She testified that she did have hobbies, doing genealogy with her mother. (Tr. at 73.) The ALJ asked about the references in the treatment notes from August and September 2017 to plaintiff taking care of her nephews, but plaintiff denied that (Tr. at 73-74); she stated that she was present while her mother watched the children, but she was not the primary person. (Tr. at 74.)

### 2. VE

The ALJ then turned to the VE, asking a hypothetical question assuming a person of plaintiff's age and education, limited to sedentary work; with occasional climbing and limited postural movements; needing to avoid heights, hazards and excessive noise, and more than occasional exposure to odors, fumes and pulmonary irritants; and able to perform simple and routine tasks, make simple work-related decisions, and tolerate occasional changes in the work setting. (Tr. at 76.) The VE testified that such a person could work as an ink printer, dial marker, and hand mounter. (Tr. at 76-77.) If the person required a walker for ambulation, just to and from the work station, it would not impact these positions; if, however, the walker was used for standing it would eliminate the jobs. (Tr. at 77.)

### 3. Plaintiff's Mother

13

Plaintiff's mother, Judy Robinson, testified that she saw plaintiff every day. Robinson indicated it was hard for plaintiff to go out, and she spent most of her time watching TV or on the computer. Whenever she did go out, to the grocery store or a doctor's appointment, she got super tired. Robinson spent at least two hours assisting plaintiff with personal care such as bathing. (Tr. at 83.) Plaintiff also experienced short term memory problems, forgetting things. (Tr. at 84.)

## D.    ALJ's Decision

On September 24, 2020, the ALJ issued an unfavorable decision. (Tr. at 7.) The ALJ noted that plaintiff was most recently found disabled in a decision dated January 27, 2015, which was the comparison point decision. (Tr. at 11.) At the time of the CPD, plaintiff was found to have the severe impairments of right hip degenerative joint disease, history of cerebral cavernous malformation, status post brain surgery, status post total left hip replacement, obesity, and dementia. These impairments were found to meet Listing 1.02A. (Tr. at 12.)

The ALJ found that the medical evidence established that, since October 9, 2018, plaintiff had the medically determinable impairments of status post bilateral total hip replacement, right knee degenerative joint disease, history of cerebral cavernous malformation, status post brain surgery, obesity, headaches, vertigo, somatic symptom disorder, dependent personality disorder, and mild cognitive impairment. The ALJ then determined that since October 9, 2018, plaintiff did not have an impairment that met or medically equaled a Listing. Specifically, the record failed to demonstrate that plaintiff had significant restriction of function in her affected joints resulting in the inability to perform fine or gross movements or ambulate effectively, as required by Listings 1.02 and 1.03. (Tr. at 12.) The record also failed to show that plaintiff's neurological/spinal cord disorder met the criteria of Listing 11.08: (A) complete

14

loss of function persisting for three consecutive months after the disorder; (B) disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities persisting for three consecutive months after the disorder; or (C) marked limitation in physical functioning and in one of the areas of mental functioning—(1) understanding, remembering or applying information, (2) interacting with others, (3) concentrating, persisting or maintaining pace, or (4) adapting or managing oneself.  (Tr. at 12.)  Finally, the ALJ found that plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.02, 12.08, and 12.09, producing no more than mild to moderate limitations in the areas of mental functioning. (Tr. at 13-14.)

The ALJ next determined that medical improvement occurred by October 9, 2018. Specifically, plaintiff's right hip improved following her total hip replacement in July 2017. During her 12-month follow-up in July 2018, plaintiff reported doing well without any pain. Although the record documented instances of her using a walker for ambulation, the overall record indicated that there was no medical need for a walker.  (Tr. at 14.)  The ALJ further noted that many of the physical examinations indicated normal or near normal findings, including instances of normal gait.  The agency consultative examiners noted that plaintiff had a walker but added that she did not appear to be using it for support.  In March 2019, her primary provider noted that plaintiff's ambulation significantly improved following her right hip replacement surgery, and her physical examination at that time was unremarkable.  Although Dr. Bake, plaintiff's neurologist, found mild bilateral lower extremity weakness in March 2020, the remainder of his exam was largely normal, and he did not feel plaintiff needed to elevate her legs or use an assistive device.  Based on this evidence, the ALJ found that plaintiff no

15

longer met the requirements of Listing 1.02A.  The ALJ further concluded that the medical improvement was related to plaintiff's ability to work because, by October 9, 2018, plaintiff's impairments no longer met or equaled the same Listing met at the time of the CPD.  (Tr. at 15.)

The ALJ determined that plaintiff continued to have severe impairments since October 9, 2018.  Her bilateral total hip replacements, right knee degenerative joint disease, history of cerebral cavernous malformation, status post brain surgery, obesity, headaches, vertigo, somatic symptom disorder, dependent personality disorder, and mild cognitive impairment caused more than minimal limitation on her ability to work.  (Tr. at 15.)

The ALJ next determined that based on her current impairments plaintiff had the RFC to perform sedentary work, with limited climbing and postural movements; avoiding heights/hazards, more than moderate noise or typical office lighting, and more than occasional exposure to dust, odors, fumes, and other pulmonary irritants; and further limited to simple and routine tasks, simple work-related decisions, and only occasional changes in the work setting. (Tr. at 15.)  In making this determination, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence.  (Tr. at 16.)

Regarding the symptoms, the ALJ acknowledged the required two-step process, under which he had to first determine whether plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce the symptoms.  Second, once such an impairment had been shown, he had to evaluate the intensity, persistence, and limiting effects of the symptoms.  For this purpose, if the symptoms were not substantiated by objective medical evidence, the ALJ had to make a finding on the consistency of the statements based on the entire record.  (Tr. at 16.)

Plaintiff asserted that she remained unable to work primarily because of intra-cranial

16

aneurysm, polycystic ovarian syndrome, memory loss, left-sided numbness, irritable bowel syndrome, vertigo, dizziness, and headaches. More specifically, she alleged ongoing difficulty with her ability to sit, stand, walk, lift, squat, bend, reach, kneel, climb stairs, use her hands, talk, see, understand, remember and concentrate, all of which allegedly limited her ability to complete normal activities of daily living. In her initial pre-hearing function report, plaintiff reported she could walk three minutes, pay attention seven hours, and lift 25 pounds, but she later reported that she could lift only 10 pounds, walk only 10 feet, and pay attention only one hour. (Tr. at 16.)

Plaintiff's medical history included a history of cerebral cavernous malformation and brain surgery in 2002, with residual vertigo, dizziness, headaches, left-sided numbness, and short-term memory loss. (Tr. at 16-17.) Plaintiff also underwent left hip replacement surgery in 2010, right ankle surgery in 2014, and right hip replacement in 2017. Subsequent scans revealed satisfactory healing, and plaintiff thereafter reported doing well without any right hip pain. (Tr. at 17.)

By August 2018, plaintiff exhibited full grip strength bilaterally, intact dexterity, and full upper extremity range of motion. Although there was some stiffness in her hip, the consultative examiner noted that her gait appeared stable, and she appeared to use her walker for more of a confidence issue as she failed to put any weight on it. (Tr. at 17.)

In March 2019, plaintiff sought clearance to travel to Hawaii for her 40th birthday, which the ALJ found suggested greater functionality than plaintiff and her mother alleged. On exam, the provider noted plaintiff was without medical concerns, demonstrated much improved ambulation following her right hip replacement, and despite having some balance issues secondary to her brain tumor was doing "quite well." Although she complained of recurrent

17

headaches and intermittent dizziness secondary to anxiety in December 2019, plaintiff denied headache, focal weakness, sensory or visual changes in January 2020.  (Tr. at 17.)

Nevertheless, the provider complied with plaintiff's request at that time for referral to a neurologist, Dr. Bake, who on exam noted that plaintiff appeared in no distress and exhibited normal language, intact memory and attention span, and only mild difficulty with multi-step commands.  Although she displayed a narrow-based gait and used a walker, Dr. Bake concluded that she did not require use of an assistive device.  (Tr. at 17.)  Dr. Bake also concluded that plaintiff's neurological examination was significant for a mild degree of cognitive impairment and mild bilateral lower extremity weakness.  (Tr. at 17-18.)

Dr. Bake prescribed Riboflavin for plaintiff's headaches, but she later denied taking any headache medications, opting instead to go into a quiet dark room until it subsided, which, the ALJ concluded, failed to connote a genuine attempt to relieve her allegedly disabling condition.  The ALJ nevertheless considered plaintiff's allegations of headache, dizziness, and light sensitivity in crafting the RFC.  The ALJ likewise considered her history of hip replacement, mild lower extremity weakness, and her obesity in limiting her to less than a full range of sedentary work.  (Tr. at 18.)  The ALJ noted that while plaintiff's BMI placed her in the "extreme" obesity range, she alleged no specific problems related to her weight.  The ALJ further noted that plaintiff's daily activities generally supported the conclusion that obesity had not limited plaintiff's functioning to a degree inconsistent with the RFC.  (Tr. at 18.)

With regard to her mental impairments, plaintiff reported experiencing forgetfulness and difficulty concentrating, following oral instructions, completing tasks, and getting along with others due to frustration.  Despite her reported symptoms, plaintiff admitted that she could watch television five hours per day, read four hours per day, write one hour per day, perform

18

genealogy research up to six hours per day, pay attention seven hours per day, follow written instructions, and manage her personal and medical care with her mother's assistance. Moreover, in January 2020, plaintiff reported that she could type effectively, interact with family and online, shop with relatives, and make purchases independently. (Tr. at 18, 124.)

Further, during her September 2018 consultative exam, plaintiff presented as cooperative and polite with intact grooming and hygiene, speech, eye contact, alertness, orientation, mood, thoughts, mentation, comprehension, focus, concentration, and memory. She also recalled and repeated information, completed simple calculations, followed three-step commands, and responded appropriately to questions. (Tr. at 18.) Additionally, the examiner noted that plaintiff exhibited somatic preoccupation throughout the evaluation consistent with somatic symptom disorder due to her ongoing pursuit of medical opinions despite having unremarkable findings, as well as dependent personality disorder. Similarly, the examiner noted plaintiff's screening test for mental capacity did not indicate any significant memory loss, as plaintiff alleged. Thus, the examiner concluded that plaintiff had only mild impairment remembering complex instructions and maintaining persistence with work demands, and no limitation in any other areas assessing her work capacity. The ALJ gave significant weight to this opinion as it was consistent with plaintiff's presentation during the consultative exam and supported by her reported functionality, including her ability to watch television five hours per day, read four hours per day, write one hour per day, perform genealogy research up to six hours per day, and follow written instructions. (Tr. at 19.)

While plaintiff's treating provider noted mild cognitive impairment thereafter, plaintiff demonstrated normal alertness, orientation, mood, affect, speech, and behavior, and her provider cleared her for travel to Hawaii. Further, in response to plaintiff's request for a medical

19

opinion regarding her disability application, the treating provider noted plaintiff had only mild anxiety and depression when outside her home due to becoming overwhelmed easily in loud environments. The ALJ considered plaintiff's sensitivity to noise when restricting her to work environments with only moderate noise levels. The ALJ also considered the report from plaintiff's social worker indicating that she received care-giver services, as well as the findings of Dr. Bake indicating mild difficulty with multi-step commands consistent with mild cognitive impairment. The ALJ considered these findings in limiting plaintiff to simple tasks, simple work related decisions, and only occasional changes in a routine work setting. (Tr. at 19.)

Therefore, after reviewing the evidence, the ALJ found that plaintiff's current impairments could reasonably be expected to produce the alleged symptoms. However, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the evidence of record for the reasons explained in the decision. (Tr. at 19.)

As for the medical opinions, the ALJ gave little weight to the October 2018 opinion of the agency consultant who found plaintiff capable of light work. The ALJ gave some weight to the August 2019 opinion of the consultant who found plaintiff capable of a reduced range of light work, with standing and walking at least two hours, among other limitations. The ALJ found the limitation to reduced standing and walking consistent with the opinion of the consultative medical examiner regarding plaintiff's lack of confidence in her motor function, despite her display of steady gait. However, the combination of plaintiff's obesity, balance issues, reduced hip range of motion, perceived lower extremity weakness, and history of bilateral hip replacements failed to support limitation to light exertion. Rather, these deficits supported a further limitation to a reduced range of sedentary exertion. (Tr. at 20.)

20

The ALJ gave some weight to the October 2018 opinion of the agency psychological consultant who concluded that plaintiff was not significantly limited with regard to her ability to understand, remember, and sustain concentration and persistence, and no more than moderately limited with regard to her social interactions and ability to adapt. The consultant also concluded that plaintiff could perform unskilled work. The ALJ found this opinion consistent with the report of the agency consultative psychological examiner and supported by plaintiff's limited social interactions and reliance on her family due to her impairments. (Tr. at 20.)

The ALJ gave little weight to the August 2019 opinion of the agency psychological consultant, who found plaintiff's mental impairments non-severe. While plaintiff's mental status exams were generally normal, this opinion was inconsistent with the opinion of the agency psychological consultative examiner and failed to consider adequately plaintiff's dependence on her family for assistance and limited social interactions due to her impairments. (Tr. at 20.)

The agency consultative medical examiner opined that plaintiff should use the roller walker for a period of time as she developed strength and confidence, and due to her obesity. The ALJ gave this opinion little weight, as it was inconsistent with plaintiff's steady gait, normal lower extremity range of motion, and upper extremity strength, and unsupported by plaintiff's radiographic imaging showing satisfactory alignment without hardware failure. The opinion was also vague as the examiner failed to identify the duration for which plaintiff required use of a walker. Nonetheless, the ALJ considered plaintiff's subjective allegations and obesity when determining RFC. (Tr. at 20.)

The ALJ gave little weight to the April 2020 opinion of Dr. Bake, plaintiff's neurologist, limiting plaintiff to less than a full range of sedentary exertion with about two hours of sitting,

21

less than two hours of standing/walking, and the need for position changes, unscheduled breaks, time off task and absenteeism, among other limitations. Likewise, the ALJ gave little weight to the May 2020 opinion of Jennifer Boerger, plaintiff's treating nurse practitioner, limiting plaintiff to less than a full range of sedentary work with about two hours of sitting, standing and walking, need for position changes, unscheduled breaks, leg elevation, use of a cane, no hand usage, time off task, and absenteeism, among other limitations. First, the ALJ noted that the determination of disability is a finding reserved for the Commissioner. Second, Dr. Bake rendered his opinion just one month after establishing care with plaintiff, which rendered this opinion less persuasive. Third, Dr. Bake and NP Boerger failed to provide any objective evidence to support their opinions. Fourth, the extreme limitations contained in their opinions were inconsistent with plaintiff's generally normal physical exams, negative radiographic findings, lack of medical complaints, and reported functionality. Moreover, Dr. Bake's opinion that plaintiff did not need an assistive device or to elevate her legs was inconsistent with NP Boerger's opinion that plaintiff required these limitations. The ALJ found Dr. Bake's opinion against these limitations consistent with plaintiff's display of steady and improved gait. Nonetheless, the ALJ considered these opinions, in combination with the objective evidence, when limiting plaintiff to less than a full range of sedentary work. (Tr. at 21.)

The ALJ gave some weight to the hearing testimony of Judith Robinson, plaintiff's mother, who offered insight into the severity of plaintiff's impairments and ability to function. For example, Robinson reported that she assisted plaintiff with her daily physical and medical care, and noted her limited functionality. The ALJ found this testimony entitled to some consideration and weight, although he did not rely solely on this testimony when formulating the RFC. (Tr. at 21.)

Based on all the evidence, even after taking into account the exacerbating impact of plaintiff's obesity, the ALJ was unable to conclude that plaintiff, as a result of her hip replacements, right knee degenerative joint disease, history of cerebral cavernous malformation, status post brain surgery, headaches, vertigo, somatic symptom disorder, dependent personality disorder, and mild cognitive impairment, was limited beyond the capacity to perform less than a full range of unskilled, sedentary work. The RFC considered all of the objective evidence as well as plaintiff's subjective symptoms and alleged limitations. (Tr. at 21.) To the extent plaintiff's allegations were inconsistent with that assessment, those allegations were not accepted. (Tr. at 21-22.)

The ALJ determined that plaintiff had no past relevant work, was age 39 as of October 9, 2018, and had at least a high school education. (Tr. at 22.) Finally, considering her age, education, work experience, and RFC based on current impairments, the ALJ found that plaintiff could perform a significant number of jobs in the economy, as identified by the VE, including ink printer, dial marker, and hand mounter. (Tr. at 22-23.) The ALJ accordingly found that plaintiff's disability ended on October 9, 2018, and that she had not become disabled again since that date. (Tr. at 23.)

On January 7, 2021, the Appeals Council denied review (Tr. at 1), making the ALJ's decision final for purposes of judicial review. See Kaplarevic v. Saul, 3 F.4th 940, 942 (7th Cir. 2021). This action followed.


### III. DISCUSSION

Plaintiff's letter-brief discusses her physical and mental impairments and related symptoms and limitations. (R. 16 at 1-2.) She proceeds pro se, which obligates me to construe

23

her papers liberally. Nevertheless, even pro se litigants "must present arguments supported by legal authority and citations to the record." Cadenhead v. Astrue, 410 Fed. Appx. 982, 984 (7th Cir. 2011). Plaintiff does not identify any specific legal or factual error in the ALJ's decision. I first conduct a general review of the decision, before considering the assertions in plaintiff's briefs.

## A.   ALJ's Decision

The ALJ followed the required seven-step evaluation process and supported his findings at each step with substantial evidence. First, the ALJ identified plaintiff's medically determinable impairments, finding that they did not meet or equal a Listing, specifically considering the musculoskeletal, neurological, and mental sections, as well as the associated Rulings pertaining to obesity and headaches. (Tr. at 12-14.) In making this determination, the ALJ properly considered all of plaintiff's impairments, not just the hip condition upon which the CPD was based. Plaintiff makes no argument that the ALJ erred in this determination, and no medical source opinion in the record indicates that plaintiff currently meets or equals any Listing.

Second, the ALJ determined that medical improvement occurred since the January 2015 CPD, which had continued plaintiff's disability based on the medical determination that her hip impairment met Listing 1.02A. In support of this finding, the ALJ cited evidence showing that plaintiff's right hip improved following her July 2017 surgery. (Tr. at 14, citing Tr. at 414-15, 481, 486-87, 503, 521, 572, 587, 676.) The ALJ referenced numerous physical exams documenting normal or near normal findings, including instances of normal gait (Tr. at 15, citing Tr. at 481, 503, 572-73, 587, 655, 681, 732), and noted that at her 12-month follow-up in July 2018 plaintiff reported doing well without any pain (Tr. at 14, citing Tr. at 626). The ALJ

24

acknowledged references in the record to plaintiff using a walker, but he countered with the observations of the agency consultative examiners that plaintiff used the walker for confidence rather than support. (Tr. at 15, citing Tr. at 681, 686.) In March 2019, NP Boerger, plaintiff's primary provider, noted that since the second hip replacement plaintiff's ambulation had much improved (Tr. at 15, citing Tr. at 747); in March 2020, Dr. Bake, plaintiff's treating neurologist, found only mild bilateral lower extremity weakness (Tr. at 15, citing Tr. at 1040); and in his subsequent report, Dr. Bake saw no need for an assistive device (Tr. at 15, 1009). Plaintiff does not contest the finding of medical improvement related to her hip impairment.

Third, the ALJ concluded that the medical improvement related to plaintiff's ability to work because her impairments no longer met or equaled the same Listing met at the time of the CPD. (Tr. at 15.) In making this finding, the ALJ followed the regulation stating that where the most recent favorable decision was based on a Listing, an RFC assessment would not have been made. In that situation, "If medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to your ability to work." 20 C.F.R. § 416.994(b)(2)(iv)(A).

Based on this finding, the ALJ correctly moved to step five, identifying all of plaintiff's current, severe impairments: bilateral hip replacements, right knee degenerative joint disease, history of cerebral cavernous malformation, status post brain surgery, obesity, headaches, vertigo, somatic symptom disorder, dependent personality disorder, and mild cognitive impairment. (Tr. at 15.) The ALJ then crafted a highly restrictive RFC based on plaintiff's current impairments, limiting her to sedentary work, with limited climbing and postural movements; avoiding hazards, excessive noise or bright lights, and more than occasional

25

exposure to fumes, odors, and pulmonary irritants; and involving simple, routine tasks, simple work-related decisions, and occasional changes in the work setting. (Tr. at 15.) In making this finding, the ALJ considered plaintiff's allegations, finding them not entirely consistent with the record, and the medical opinions, finding plaintiff somewhat more limited than the agency consultants but discounting the reports of NP Boerger and Dr. Bake suggestive of disability. (Tr. at 16-21.)

Plaintiff does not challenge the ALJ's evaluation of the opinion evidence, but for the sake of completeness I note that the ALJ provided sound reasons for his determination. The ALJ reasonably noted that Dr. Bake offered his opinion just one month after establishing care with plaintiff. See Scheck v. Barnhart, 357 F.3d 697, 702-03 (7th Cir. 2004) (discounting treating source opinion where the provider lacked a detailed, longitudinal view of the claimant's condition). The ALJ further noted that NP Boerger and Dr. Bake provided no objective evidence to support their opinions, see McFadden v. Berryhill, 721 Fed. Appx. 501, 505 (7th Cir. 2018) (discounting opinion lacking objective medical support), and that the extreme limitations set forth in their reports were inconsistent with plaintiff's generally normal physical examinations, negative radiographic findings, lack of medical complaints, and reported functionality. See Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016) (discounting opinion "due to lack of consistency"). Finally, the ALJ noted that the two treating providers contradicted each other regarding the need for an assistive device and leg elevation; the ALJ reasonably found Dr. Bake's opinion on this issue more consistent with the evidence, including plaintiff's display of steady and improved gait. (Tr. at 21.)

The ALJ also considered the agency consultant opinions, giving some weight to Dr. Fowler's assessment that plaintiff could perform a reduced range of light work but finding a

further limitation to sedentary work warranted given plaintiff's obesity, balance issues, reduced hip range of motion, and lower extremity weakness. The ALJ also credited the opinions of Drs. Rao and Kocina that plaintiff's mental impairments were severe but produced no more than mild to moderate limitations; the ALJ rejected Dr. Pape's opinion that the mental impairments were non-severe. The ALJ's RFC finding was thus more limiting than that of any agency doctor or psychologist, "illustrating reasoned consideration given to the evidence [plaintiff] presented." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019).

At step six, the ALJ found that plaintiff had no past relevant work. (Tr. at 22.) He thus proceeded to the final step, finding that plaintiff could perform other jobs as identified by the VE. (Tr. at 22-23.) Plaintiff does not challenge the VE's testimony or the ALJ's step seven conclusion.

Plaintiff points to no specific medical evidence, overlooked by the ALJ, suggesting greater limitation than the ALJ found. Instead, she relies on her own reports of symptoms and limitations. But the ALJ found plaintiff's claims of disabling limitations inconsistent with the record, a finding which—for the reasons set forth below—cannot be deemed "patently wrong." See Wilder v. Kijakazi, 22 F.4th 644, 653 (7th Cir. 2022) ("This Court will uphold an ALJ's credibility determination unless that determination is patently wrong.") (internal quote marks omitted); see also Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong.") (internal quote marks omitted).

## B. Plaintiff's Main Brief

As indicated, plaintiff's brief consists primarily of a recitation of her impairments and related symptoms and limitations. (R. 16.) As the Commissioner notes, she does not cite to

27

any evidence in the record in support of her arguments, nor does she identify any specific error in the ALJ's decision. (R. 24 at 10.) Her primary contention appears to be that the ALJ should have given more weight to her subjective complaints. While the ALJ must consider such evidence, "statements about your pain or other symptoms will not alone establish that you are disabled." 20 C.F.R. § 416.929(a); see also Scheck, 357 F.3d at 702 ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."). As summarized above, the ALJ fully considered plaintiff's hearing testimony and pre-hearing reports, partially accepting her allegations in crafting a highly restrictive RFC, but rejecting those statements which could not be accepted as consistent with the evidence of record. (Tr. at 16-21.) A reviewing court is not permitted to redetermine credibility, substituting its judgment for that of the ALJ. E.g., Burmester, 920 F.3d at 510.

Plaintiff first indicates that following her 2002 brain surgery she continued to experience problems with her left arm, which the ALJ did not take into account in determining her ability to work. (R. 16 at 1.) The ALJ acknowledged plaintiff's reports of residual problems after the surgery, including left-sided numbness, with ongoing difficulty lifting, reaching, and using her hands, all of which allegedly limited her ability to complete normal activities of daily living. (Tr. at 16.) As the ALJ noted, however, at the August 2018 consultative exam plaintiff exhibited full grip strength bilaterally, intact dexterity for fine and gross movements, and full upper extremity range of motion. (Tr. at 17, citing Tr. at 681.) Subsequent exams from treating providers documented no issues with the upper extremities. (Tr. at 17, citing Tr. at 739, 745, 999.) Moreover, the agency medical consultants, whose reports the ALJ partially credited, found no manipulative limitations (Tr. at 20, 714, 953); Dr. Bake also declined to impose any manipulative limitations (Tr. at 1009). NP Boerger opined that plaintiff could never use her

28

hands, fingers, or arms (Tr. at 21, 1014), but the ALJ rejected that extreme limitation as inconsistent with the record. In sum, the ALJ's decision reveals that he considered plaintiff's alleged left-sided numbness and weakness, but concluded that it did not require the inclusion of related limitations in the RFC. See Blom v. Barnhart, 363 F. Supp. 2d 1041, 1056 (E.D. Wis. 2005) (noting that the ALJ need not include every limitation alleged by the claimant, only those supported by the evidence) (citing Ehrhart v. Sec'y of HHS, 969 F.2d 534, 540 (7th Cir. 1992)).

Plaintiff next indicates that she suffers from vertigo three to five times per month, which she also relates to the brain surgery and an assault occurring shortly thereafter. She contends that she could not keep a job if she missed three to five days per month. (R. 16 at 1.) The ALJ considered this issue as well, including vertigo in the list of severe impairments (Tr. at 15) and acknowledging plaintiff's complaints of ongoing dizziness (Tr. at 16). However, the ALJ also noted that in March 2019, when plaintiff sought clearance to travel to Hawaii for vacation, she was without "medical concerns," demonstrated "much improved" ambulation following her right hip replacement, and despite having some balance issues secondary to her brain tumor was doing "quite well." (Tr. at 17, citing Tr. at 747.) The ALJ further noted that in January 2020 plaintiff denied undergoing any treatment for vertigo. (Tr. at 17.) Plaintiff's provider referred her to neurology at that time (Tr. at 17), and the neurologist's exam revealed only mild cognitive impairment and mild lower extremity weakness (Tr. at 18, citing Tr. at 1040). The ALJ also considered plaintiff's use of a walker for balance, accepting the neurologist's view that plaintiff did not require the use of an assistive device. (Tr. at 17.) Nonetheless, the ALJ gave some consideration to plaintiff's subjective reports of dizziness in determining RFC (Tr. at 18), restricting her from heights and hazards (Tr. at 15). The evidence does not compel further restrictions related to vertigo. See Gedatus v. Saul, 994 F.3d 893, 900 (7th Cir. 2021) ("We will

29

reverse only if the record compels a contrary result.") (internal quote marks omitted).

Plaintiff indicates that she also suffers from chronic headaches. She indicates that medicine does not help, but they only last one hour to a few. Some she can endure and continue her normal activities, while others require her to lay down in a darkened room. "Certain jobs I cannot do if it is too loud." (R. 16 at 1.) The ALJ considered this issue as well, including headaches in the list of severe impairments (Tr. at 15) and acknowledging the references to headaches in plaintiff's medical history (Tr. at 16). However, an April 2018 head CT revealed no acute intra-cranial pathology or traumatic injury (Tr. at 17, citing Tr. at 589), and as with vertigo, in January 2020 plaintiff denied undergoing treatment for headaches (Tr. at 17). The provider referred plaintiff to a neurologist, who prescribed Riboflavin, but plaintiff "later denied taking any headache medication, opting instead to go into a quiet, dark room until it subsides, which fails to connote a genuine attempt to relieve her allegedly disabling condition." (Tr. at 18, citing Tr. at 1054.) The ALJ further noted that, contrary to her complaints of vision changes secondary to headaches, plaintiff's optical examination was normal. (Tr. at 18, citing Tr. at 1059.) Nonetheless, the ALJ gave some weight to plaintiff's allegations of headaches and light/noise sensitivity in the RFC (Tr. at 18), limiting her to "moderate noise" and "lighting no brighter than in a typical office environment." (Tr. at 15.) Plaintiff cites no evidence compelling greater limitations.

Plaintiff further indicates that she has irritable bowel syndrome, using the bathroom 10 to 12 times per day. She doubts an employer would permit that many bathroom breaks. (R. 16 at 1.) The ALJ did not include IBS in the list of plaintiff's severe, medically determinable impairments (Tr. at 12), and plaintiff cites no medical evidence demonstrating that it significantly limits her ability to do basic work activities. See 20 C.F.R. § 416.920(c); see also 20 C.F.R. §

30

416.921 ("[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source. We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)."). The ALJ acknowledged that plaintiff alleged irritable bowel syndrome in a pre-hearing report and in her hearing testimony (Tr. at 16, 67-68, 228), but at the hearing plaintiff reported no treatment recommendations other than pads and diet modification (Tr. at 68). Moreover, the agency reviewers were aware of this alleged impairment and suggested no limitations. (Tr. at 683, 718, 948, 957.) While the ALJ should perhaps have said more about this issue in his decision, in the absence of medical evidence supporting work-related limitations, any error was harmless.[5] See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (finding ALJ's failure to consider an impairment harmless where the reviewing doctors were aware of it and the claimant only speculated about work limitations).

Plaintiff next references her balance issues and use of a walker. She indicates she has fallen in the past, and that her doctors have also discovered degenerative changes in her knees. (R. 16 at 1.) Plaintiff indicates that while her walking did improve following the hip replacements, her knees hurt when she climbs stairs or sits for extended periods without a recliner. (R. 16 at 1-2.) She also reports problems bending and sitting for long periods without neck support. (R. 16 at 2.) The ALJ included right knee degenerative joint disease in the list of severe impairments (Tr. at 12), and he fully considered plaintiff's use of a walker, agreeing

---

[5]The medical records contain scattered references to IBS in plaintiff's history (e.g., Tr. at 418, 565, 748, 1055), but I have found no specific indications of treatment for, or limitations related to, this impairment, and plaintiff often denied GI symptoms (Tr. at 420, 502, 567, 575-77, 648-50, 733-34, 747). Plaintiff was seen for diarrhea in April 2019 and January 2020, but these appear to have been acute problems, with providers assessing gastroenteritis and treating plaintiff symptomatically. (Tr. at 737-40, 982-83.)

with the agency consultants and Dr. Bake that plaintiff did not medically require an assistive device (Tr. at 20-21). He nevertheless gave some weight to plaintiff's complaints, limiting her to sedentary work; occasionally climbing ramps and stairs, balancing and stooping; never kneeling, crouching or crawling; and avoiding heights and hazards. (Tr. at 15, 18.) Plaintiff cites no evidence compelling additional limitations based on her balance problems or knee impairments.

Plaintiff next contends that she has short-term memory loss. She states that she forgets some rules of grammar and words, and no longer uses the stove because she left it on twice. (R. 16 at 2.) The ALJ fully considered these allegations as well. In discussing the mental impairment Listings, the ALJ found a moderate limitation in understanding, remembering, or applying information. Despite her allegations of deficits in this area, the record showed that plaintiff was able to prepare quick meals, shop in stores and by computer, play board games, read for hours, and follow written instructions. The record also showed that she was able to provide information about her health, follow instructions from providers, and demonstrate intact memory, orientation and cognition during exams. (Tr. at 13, citing Tr. at 736, 740, 1040.) Later, in determining RFC, the ALJ considered plaintiff's alleged memory loss (Tr. at 16, 18), again noting that her activities—including reading four hours per day, writing one hour per day, and performing genealogy research up to six hours per day—belied any claim of severe limitations (Tr. at 18). The ALJ further noted that during the psychological consultative exam plaintiff displayed intact comprehension, focus, concentration, and memory. (Tr. at 18, citing Tr. at 686.) The examiner found that plaintiff's screening test for mental capacity did not indicate any significant memory loss, contrary to plaintiff's allegation. (Tr. at 19, citing Tr. at 688.) Plaintiff's treating neurologist also noted only mild cognitive impairment. (Tr. at 19, citing

32

Tr. at 1040.)  In any event, as with the other impairments plaintiff alleges, the ALJ did not entirely discount plaintiff's allegations in this regard, limiting her to simple and routine tasks, maintaining attention and concentration for two hour segments, simple work-related decisions, and occasional changes in a routine work setting.  (Tr. at 15.)  The record does not compel further limitations.

Finally, plaintiff contends that certain smells cause nausea.  (R. 16 at 2.)  Again, the ALJ considered plaintiff's allegations of "smell sensitivity" in the RFC (Tr. at 18), limiting her exposure to dust, odors, fumes, and other pulmonary irritants.  (Tr. at 15.)  Plaintiff develops no argument that the ALJ was required to do more.

## C.    Plaintiff's Supplemental Brief

In a supplemental brief, plaintiff indicates that she was initially awarded disability benefits in 2007 based on code 4380 (vascular insult to the brain).  She indicates that in 2009 a second code was entered—175 (necrosis of the hip)—but she was not diagnosed with this condition until 2010.  She wonders why code 4380 was dropped, since she still experiences symptoms including left arm weakness, vertigo, and nausea.  She acknowledges that her hips are better but contends that she now has knee problems, in addition to still having the conditions that stopped her from working in 2007.  (R. 17.)

The 2015 CPD continued plaintiff's benefits based on her hip impairment.  The record does not disclose precisely when and why the basis for disability may have shifted from the brain injury to the hip impairment.  Regardless, the ALJ properly considered all of plaintiff's impairments, including her knee problems and her previous brain surgery and residual symptoms, in making the decision under review.  Plaintiff fails to explain how she was harmed by any change in the disability "code" after she was initially awarded benefits.  This argument

33

accordingly provides no basis for remand.

### IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of March, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

34